Rodney L. SUMLER, Plaintiff,

v.

CITY OF WINSTON–SALEM et al., Defendants.

No. C–75–172–WS.

United States District Court,
M. D. North Carolina,
Winston-Salem Division.

March 9, 1978.

Louis L. Lesesne, Jr., and Julius LeVonne Chambers of Chambers, Stein, Ferguson & Lanning, Charlotte, N. C., for plaintiff.

Roddey M. Ligon, Jr., and W. Andrew Copenhaver of Womble, Caryle, Sandridge & Rice, Ronald G. Seeber, City Atty., Winston-Salem, N. C., for defendants.

### FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

HIRAM H. WARD, District Judge.

This cause was tried before the Court without a jury, commencing on January 12, 1978. The presentation of evidence was concluded on January 18, and closing arguments were heard January 27, 1978. Based upon the evidence found to be credible, the Court enters the following findings of fact, conclusions of law, and order.

*Findings of Fact*

1. The plaintiff, Rodney L. Sumler, a black male, was first employed by the City of Winston-Salem (hereinafter "City") in the Recreation Department in 1959 on a part-time basis and thereafter worked for the Department on a temporary and summer basis until he graduated from college. He worked as a permanent employee with the Recreation Department in 1964 and 1965 and from January of 1969 to February of 1975. Sumler was terminated from his employment with the City of Winston-Salem on February 3, 1975. On May 8, 1975, he commenced this action alleging that he was discharged because of his race in violation of 42 U.S.C. § 1981; that he was denied a due process hearing in violation of 42 U.S.C. § 1983 and the Fourteenth Amendment; and that his discharge violated his

First Amendment rights of speech and of association. On January 16, 1976, the plaintiff was permitted to amend his complaint to also allege a claim of racial discrimination under the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*

2. The defendants in this action are the City of Winston-Salem; Franklin Shirley, Mayor of Winston-Salem at the time of plaintiff's dismissal; Floyd Burge, Richard Davis, Eugene Groce, C. C. Ross, Sr., Carl Russell, Sr., Ernestine Wilson, John Palmer, and Bahnson Hall, members of the Board of Aldermen of Winston-Salem at the time of plaintiff's discharge; Orville Powell, City Manager; and P. W. Swann, Director of Recreation at the time of plaintiff's discharge. All individual defendants are sued both individually and in their representative capacities as Mayor and members of the Board of Aldermen of Winston-Salem and as officers of the City.

3. At the time of Sumler's termination, the Winston-Salem Recreation Department was headed by Mr. P. W. Swann, Acting Recreation Department Director. Under Swann were three senior recreation supervisors, the plaintiff, Sue Drummond, and Phil Bostian, and one assistant to the Director, Bert Weeks. The plaintiff was the only black senior recreation supervisor, and as such, was the highest ranking black in the Recreation Department at the time of his discharge. Plaintiff's job assignment at the time of his termination was Cultural and Special Programs.

4. The City's employment records show the following:

### CAREER PROGRESSION–PERMANENT EMPLOYMENT

| | | R. Sumler | S. Drummond | P. Bostian |
|---|---|---|---|---|
| Education | | B.S. Biology | Bachelors & Masters Degrees in Recreation | B. A. in Recreation |
| Date of Permanent Employment | | 1964 and 1965 1/1/69 | 9/2/60 | 9/12/55 |
| to "Asst. Rec. Dir." | 1/1/72 | $ 945 | $1,035 | $1,035 |
| | 3/1/72 | $1,035 | $1,080 | $1,080 |
| | 9/1/73 | $1,260 | $1,260 | $1,320 |
| to "Sr. Rec. Super." | 9/1/74 | $1,320 | $1,320 | $1,320 |
| | 2/1/75 | $1,419 | $1,419 | $1,419 |

Mr. Weeks, the assistant to the Director of Recreation at the time of plaintiff's termination, became a permanent employee on 9/1/63. He has a B.A. in Recreation. He was made "Asst. to Rec. Director" on 3/1/72 and was paid $1,035 on 1/1/72, $1,080 on 3/1/72, $1,320 on 9/1/73, $1,380 on 9/1/74, and $1,584 on 2/1/75.

5. The plaintiff was considered a "professional" employee as defined by the Equal Employment Opportunity Commission (EEOC). The percentage of black professionals in the Forsyth County work force in 1975 was 6.2%, whereas, the percentage of black professionals employed by the City of Winston-Salem in April 1975 was 18.86%.

6. The percentage of black employees in the Forsyth County work force in April of 1975 was less in every EEOC job category than the percentage of blacks employed by the City of Winston-Salem.

7. Sumler was discharged from his employment with the City on February 3, 1975. The decision to terminate his employment was made by defendant Swann, who is white, and who, as Acting Director of the Recreation Department, was plaintiff's immediate supervisor.

8. The Court finds that the major reason for plaintiff's termination was violation of the City purchasing policy prohibiting a City employee from buying goods or materials in the name of the City without proper authorization for one's personal use. The plaintiff purchased three color television

sets from Ed Kelly's (a Winston-Salem retail establishment) in the name of the City Recreation Department, supposedly for city use, thereby obtaining a city-purchase discount not available to purchases for private purposes. One set was sold by the plaintiff to a private commercial establishment, Our Shop, Inc., to be used as a fund-raising raffle, and two sets were given by him to the Dungeon Club, a nonprofit social club having a "brown bagging" permit. Plaintiff was Chairman of the Board of Our Shop, Inc., and was President of the Dungeon Club.

9. The plaintiff contended that the television sets were purchased for a city function scheduled at the Benton Convention Center for January 1975 and it was only after this function was cancelled that he proceeded to dispose of the sets in his individual capacity. His testimony, however, is contradicted by a document circulated by plaintiff himself which indicated that he picked up one set and immediately delivered it to Our Shop, Inc. Also, Swann was not consulted on the purchase of the television sets as City policy required for such a purchase. Furthermore, the records at the Benton Convention Center, together with the testimony of an employee of the Convention Center, Mr. Racek, show that the lease agreement between the Center and the Recreation Department for a "Music Festival" (dance) on January 17, 1975, was voided or cancelled by plaintiff on November 27, 1974, and that there was no rescheduling of the dance. Also, the minutes of Our Shop Board meetings show that plaintiff had decided in mid-November to obtain a TV from Ed Kelly's for Our Shop.

10. The Court finds that the plaintiff purchased three television sets from Ed Kelly's in the name of the City Recreation Department for his own private use, and by purchasing in the Recreation Department's name, he obtained a discount.

11. The Court further finds that the purchase of the three television sets for plaintiff's private use constituted a valid cause for his termination.

12. The purchase of the television sets, without approval from anyone in proper authority within the City, followed an earlier purchasing violation by Sumler which had resulted in a suit being filed against him and the City. The plaintiff purchased a sign-making machine in 1972 while attending a conference of recreation personnel in Mobile, Alabama. Although he denies that the purchase was made in the name of the City, the purchase invoice was made out to the Winston-Salem Recreation Department and signed by him along with his title of "Associate Director." Since the plaintiff admits that he bought the machine for his own personal use, and without authority, the Court accordingly finds that the purchase was made by the plaintiff for his own personal use, without authority, in the name of the City of Winston-Salem.

13. When Sumler failed to pay for the sign-making machine, the seller of the machine brought suit in Forsyth County in January 1974 against plaintiff and the City of Winston-Salem to collect the balance due on the machine. Sumler subsequently paid for the machine and the suit was dismissed. As a consequence of that suit, defendants Powell and Swann both instructed the plaintiff to never again purchase anything in the name of the City without proper authorization, without following proper procedures, or for his own personal use.

14. Swann was familiar with plaintiff's personnel file prior to making a decision to terminate him. Swann felt that plaintiff had a "questionable record," particularly in light of documents in plaintiff's file and certain extraneous matters. The Court finds as a fact that Swann considered such record in his decision to discharge the plaintiff, and that such record was a minor factor in the dismissal. Swann considered the following:

(a) Purchases in 1972 by the Recreation Department for "Street Players" in violation of established procedures, for which plaintiff was partially responsible, though no purchase was made for personal use.

(b) A memorandum dated March 27, 1974, from P. W. Swann to City Manager

Orville Powell advising Powell that Sumler was suspended from work for a period of at least one day because he had "ignored repeated instructions to submit a report of his activities for the past two (2) months."

(c) A memorandum dated April 10, 1973, from City Treasurer W. E. Holland to Joe White (Recreation Director at the time), stating that "[i]t is only reasonable to ask Rodney to abide by our travel regulations."

(d) A complaint report dated June 2, 1971, indicating that plaintiff was advised that "he is wrong in allowing anyone to ride in a City car that is not involved in direct work with the Recreation Department."

(e) A memorandum dated July 31, 1973, from Orville Powell to plaintiff officially reprimanding him for misuse of his city car, indicating that he had received reports of his city car at the Dungeon Club on more than one occasion, and advising plaintiff that any similar violations of the use of city equipment will be reason for immediate suspension or dismissal.

(f) Another memorandum dated July 31, 1973, from Powell to plaintiff advising him that he was violating City regulations on outside employment and involvement in political activities. (Swann feared that plaintiff had brought adverse publicity to the City because of plaintiff's association with an organization known as the Dungeon Club, particularly as president of the Club.)

(g) A memorandum from Swann to plaintiff dated January 30, 1974, advising him of his concern about the City being sued as a result of a private purchase in the name of the City Recreation Department, his concern about plaintiff's apparent lack of consideration in dealing with the public, his concern about the apparent conflict between plaintiff and other members of the Recreation Department staff, and his concern about apparent conflict between plaintiff and other agencies with which the Recreation Department works. The memorandum also advised plaintiff that his personnel folder contained information which indicated his private life had adverse effect on his job. The memorandum also noted a prior discussion with plaintiff about the importance of public opinion concerning any recreational employee such as plaintiff whose job required working in all areas of the City.

(h) Complaints from people (both black and white), including City Manager Powell (white), and Deputy City Manager Bond (black), that plaintiff was performing poorly as an employee of the City by violating City policies and procedures, that he was so preoccupied with outside activities that it affected his ability to do his City work, and that he was not dealing with the public courteously.

15. As to the sign-making machine, Swann made no investigation of the incident and had no knowledge other than what he could see on the purchase order and what he was told by the seller's attorney.

16. As to the April 10, 1973, memorandum concerning travel expenses, Swann's only knowledge came from the memorandum. Swann made no investigation to determine the underlying facts of the situation.

17. Powell stated in a memorandum dated July 31, 1973, that plaintiff was violating the City policy against outside employment by being connected with the Dungeon Club and told him to cease being the Club's president. However, plaintiff was not employed by the Dungeon Club. Powell also stated in the same memorandum that Sumler was violating the City policy against involvement in political activities by acting as a precinct registrar. However, neither Swann nor Powell was able to specify in what respect serving as a registrar violated the City's policy against partisan political activity, as it was alleged to have done.

18. Prior to writing the July 31, 1973, memorandum, the defendant, City Manager Powell, received many complaints that plaintiff was using his city vehicle to forward the activities of the Dungeon Club,

such as hauling items and making deliveries in his city vehicle on behalf of the Club. Complaints were also received that the plaintiff's city vehicle was often parked at the Dungeon Club during what Swann and Powell considered working hours. Powell held a conference with the plaintiff in which the plaintiff was advised that he could continue being a member of the Dungeon Club but that he must disassociate himself from the Club to the extent that he would not be engaging in Dungeon Club business or representing the Club on city time.

19. In addition to his Dungeon Club activities, Sumler was also President of the Carver Civic Club, Chairman of the Board of Our Shop, Inc., and a Democratic, and later Republican, Registrar. Powell believed that in his capacities with these various activities the plaintiff took stands which led to numerous complaints that the plaintiff was violating City regulations by participating in active partisan politics and that some of his political activity was taking place at hours when the plaintiff should have been spending his time on City Recreation Department business.

20. The memorandum of July 31, 1973, was the consequence of the complaints made to Powell mentioned in paragraphs 18 and 19 above. Both defendants Powell and Swann expressed to Sumler upon more than one occasion their concern that he was engaged in outside activities when he was supposed to be working for the City and that this could not be permitted on city time because such activity would adversely affect his city work performance.

21. As to the many complaints received about plaintiff, Swann and Powell rarely investigated them.

22. The Court finds that the failure of Swann and Powell to investigate complaints and incidents involving plaintiff was not due to improper motives or reasons, such as race.

23. The Court finds that the plaintiff's association with the Dungeon Club as shown in this case and his acting as registrar were not substantial factors in his dismissal. Furthermore, the Court finds that Swann and Powell would have terminated the plaintiff even in the absence of such conduct.

24. Sumler was first confronted with the allegations against him involving the TV purchases in late January 1975 when he was informed by Swann that an investigation by a City police officer had been made and that some adverse consequences would result to his employment because of the incident. During that meeting, Swann and Sumler talked primarily about violations of City purchasing policy, particularly the TV purchases and the incident from 1972 in which plaintiff had bought a sign-making machine. Both incidents were perceived by Swann as clear and willful violations.

25. Sumler was discharged by Swann, his supervisor, on February 3, 1975, and was informed of the reasons for such discharge in a meeting with Swann on that date. Also at this time the plaintiff was given a memorandum setting forth reasons for the discharge and an attached report entitled "Sumler's Purchasing Violations." In addition to the purchasing violations, the memorandum of February 3 referred to plaintiff's "questionable record," but it did not mention the specifics of such record.

26. Sumler admitted to Swann that he had bought the television sets in the City's name, that no purchase order was obtained nor was the purchase authorized by any proper official, that he obtained discounts on the purchases, that the sets were never used for a city purpose or function, and that the sets were given to organizations in which Sumler was an officer, Our Shop and the Dungeon Club. The Court cannot say it was unreasonable for Swann to have assumed from the above admissions that plaintiff had violated City purchasing procedures and had bought the TVs for his personal use. Although Sumler admitted that the television purchases constituted violations of the City's purchasing policies, he contended that the purchases were not initially for his own use.

27. Sumler appealed his dismissal to City Manager Powell by seeking a conference with him. Powell carried out this appeal in accordance with the procedures then in effect and in accordance with the same procedures that had been followed with respect to other dismissed employees who had previously appealed to him. There was no administrative procedure available which would require a factual determination in the context of a hearing, and no procedure for summoning of witnesses or the right to cross examination. The conference with the City Manager, which lasted for approximately two hours, consisted of Powell's hearing the plaintiff argue against his dismissal. Powell did not look into the allegations personally nor did he hear any of the evidence from those other than Sumler who had firsthand knowledge. Following the meeting, City Manager Powell affirmed plaintiff's dismissal.

28. In addition to the television purchases, Powell considered several other factors. These included the sign-making machine incident, complaints of Sumler's involvement in political activity, complaints of misuse of his city car, and complaints about plaintiff not dealing with the public in a courteous manner. Powell did not investigate the merits of most of these charges and complaints.

29. After the conference with Powell, Sumler sought a hearing before the Board of Aldermen. A hearing of this type is not included as a part of the grievance procedure, and the request for a hearing was denied.

30. Section 20–17 of the Code of the City of Winston-Salem, in effect at the time of the plaintiff's dismissal, provided: "A department head may demote or dismiss any city employee for good cause. The department head shall give the employee and the city manager a statement of the reason for the action. The employee may, within fifteen (15) days of the effective date of the action, appeal to the city manager for a hearing and review. The decision of the city manager in such cases shall be final."

31. N.C.G.S. § 160A–148 provides that the City Manager is the chief administrator of the City and "shall appoint and suspend or remove all city officers and employees not elected by the people, and whose appointment or removal is not otherwise provided for by law, except the city attorney, in accordance with such general personnel rules, regulations, policies, or ordinances as the council may adopt."

32. Sumler had no contract of employment with the City.

33. The City's Employee Handbook stated that willful violation of the City's "policy concerning Personal Purchase Discount," which the plaintiff violated, "may" merit a reprimand in writing on the first occasion, that it "may" merit suspension on the second offense, and that it "may" result in termination for further violations.

34. Sumler had never been suspended for violation of the City's discount-purchase policy.

35. The plaintiff was in contact with a newspaper reporter on the same day of the termination, and Sumler discussed his termination with the reporter. Neither Powell nor Swann initiated any contact with the news media about the termination, but Swann did answer some questions of the media *after* plaintiff had talked to reporters about his dismissal.

36. The plaintiff admitted to a newspaper reporter that he had violated City purchasing policies by purchasing the three television sets, and this admission was printed in the newspaper. He also admitted telling a newspaper reporter two years after his discharge that the City could not control him and that he was responsible only to the community.

37. The plaintiff's position with the City Recreation Department after his termination was never filled.

38. Sumler felt that he was the victim of disparate treatment and that many other employees had violated City purchasing rules without being discharged. However, while the plaintiff was able to demonstrate numerous incidents of minor purchasing vi-

olations by other employees, both black and white, all such incidents concerned relatively small purchases in the City's name and *for the City's use.* The plaintiff was unable to establish a single violation by any other city employee, white or black, where items were purchased in the City's name at a City discount *for private use.* Therefore, the Court finds that the plaintiff suffered no disparate treatment, considering the nature of his purchasing violations.

39. The defendant, City of Winston-Salem, is a municipal corporation. It had fifteen or more employees in each of twenty or more weeks during the calendar year 1975.

## DISCUSSION

The plaintiff claims that he was wrongfully terminated from his employment, that such termination was due to his race and to his exercise of freedom of speech and association. He also claims that he was denied a due process hearing and that the City failed to follow its own rules and regulations.

*Termination Due to Race*

██ In discriminatory employment cases under Title VII, the complainant must:

carry the initial burden . . . of establishing a prima facie case of racial discrimination. This may be done by showing (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected, and (iv) that, after his rejection, the positions remained open and the employer continued to seek applicants from persons of complainant's qualifications.

*McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668, 677 (1973).

Though *McDonnell Douglas* was a hiring case, it has been cited and used in discharge cases. One court has ruled that "in order to make out a prima facie case of discriminatory discharge, a Title VII plaintiff must show . . . that he is a member of a

class entitled to the protection of the Civil Rights Act, that he was discharged without valid cause, and that the employer continued to solicit applications for the vacant position." *Potter v. Goodwill Industries of Cleveland,* 518 F.2d 864, 865 (6th Cir. 1975). The Fifth Circuit stated that for a prima facie case of discrimination, it must be shown that plaintiff "was replaced with a person outside the protected group." *Price v. Maryland Casualty Co.,* 561 F.2d 609, 612 (5th Cir. 1977).

██ In the instant case, plaintiff has failed to establish a prima facie case of racial discrimination in his termination under the *McDonnell Douglas, Potter,* and *Price* approach. He was discharged for a valid cause: violation of the City policy prohibiting purchasing for one's personal use and purpose in the name of the City and thereby obtaining a discount on such purchases. In addition to the absence of an invalid cause of dismissal, the plaintiff was not replaced with a non-black; his position with the Recreation Department was never filled after his discharge.

██ If a plaintiff can show a past and present practice of general discrimination against blacks, then this may be sufficient for a prima facie showing. The Supreme Court recently said that "proof of the pattern or practice [of discrimination] supports an inference that *any particular employment decision,* during the period in which the discriminatory policy was in force, was made in pursuit of that policy." *Teamsters v. United States,* 431 U.S. 324, 362, 97 S.Ct. 1843, 1868, 52 L.Ed.2d 396, 431 (1977) (emphasis added). *See also,* as to examination of patterns and practice of discrimination, *Brown v. Gaston County Dyeing Machine Co.,* 457 F.2d 1377, 1382 (4th Cir. 1972). There was no credible evidence indicating a practice of general discrimination against blacks at the time of plaintiff's termination. In fact, in 1975 the percentage of blacks employed by the City of Winston-Salem was more than the percentage of black employees in the Forsyth County work force in every EEOC category. Also, the salaries of

plaintiff and his co-senior recreation supervisors were the same, even though the others had degrees in recreation and more seniority with the City.

Sumler claims that white employees guilty of similar conduct were never terminated and that this indicates racial discrimination. The Supreme Court addressed a similar charge in *McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976). Title VII does not permit an employer to use a former employee's conduct as a pretext for racial discrimination. Plaintiff need not show he would have been discharged solely on the basis of race in any event, without regard for the alleged pretextual deficiencies, since no more is required to be shown than that race was a "but-for" cause. While an employer may decide that certain conduct may render an employee unqualified for employment, this criteria must be applied alike to members of all races. In the instant case, there was no credible evidence that white employees were guilty of similar conduct and were never terminated.

Therefore, the plaintiff was not terminated because of his race.

### Termination for Exercise of First Amendment Rights

A public employee may not be discharged from his employment for the exercise of his First Amendment Rights. *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). This principle is applied regardless of the public employee's contractual or other claim to the job. However, "the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." *Pickering v. Board of Education*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811, 817 (1968). "[T]he government should be able to regulate activities which directly interfere with the proper performance of its employees' duties." *Hobbs v. Thompson*, 448 F.2d 456, 470 (5th Cir. 1971). "How-

ever, government regulations and restrictions on the exercise of First Amendment freedoms 'should not lightly be imposed.'" *Smith v. United States*, 502 F.2d 512, 516 (5th Cir. 1974).

The Fifth Circuit has adopted a "material and substantial interference" standard. "In order for the government to constitutionally remove an employee from government service for exercising the right of free speech, it is incumbent upon it to clearly demonstrate that the employee's conduct substantially and materially interferes with the discharge of duties and responsibilities inherent in such employment." *Smith v. United States, supra*, at 517.

Although this Court is not ready at this time to adopt such a "material and substantial interference" standard, it does require more than unsubstantiated assertions by defendants Swann and Powell that plaintiff's association with the Dungeon Club interfered with his City employment. In fact, Swann testified that Sumler "did a good job." Therefore, the association with the Dungeon Club as shown in this case would not be a constitutionally valid reason for terminating the plaintiff.

As to restrictions on political activity, state employees may be forbidden from:

> Soliciting contributions for partisan candidates, political parties, or other partisan political purposes; becoming members of national, state, or local committees of political parties, or officers or committee members in partisan political clubs . . .; taking part in the management or affairs of any political party's partisan political campaign; . . . addressing or taking an active part in partisan political rallies or meetings; soliciting votes or assisting voters at the polls or helping in a partisan effort to get voters to the polls; [and] participating in the distribution of partisan campaign literature. . . .

*Broadrick v. Oklahoma*, 413 U.S. 601, 616–17, 93 S.Ct. 2908, 2918, 37 L.Ed.2d 830, 843 (1973).

However, this prohibition is for *"clearly partisan* political activity." *Ibid* at 617, 93 S.Ct. at 2918, 37 L.Ed.2d at 843 (emphasis added). There was no evidence that Sumler participated in clearly partisan political activity by acting as a precinct registrar, and being a registrar would not be a constitutionally valid reason for terminating the plaintiff.

■ However, even if the protected conduct of speech or association played a "substantial part" in the actual decision to terminate, it would not necessarily amount to a constitutional violation justifying remedial action. Initially, the burden is on the plaintiff to show that his conduct was constitutionally protected and that this conduct was a "substantial factor"—or to put it in other words, that it was a "motivating factor"—in the decision to terminate him. If the plaintiff carries that burden, the Court should determine whether the defendant employer has "shown by a preponderance of the evidence that it *would have reached the same decision* as to . . . [plaintiff's termination] *even in the absence of the protected conduct."* *Mt. Healthy City School Dist. Bd. of Ed. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471, 484 (1977) (emphasis added).

■ Plaintiff's constitutionally protected conduct was *not* a substantial factor in his discharge, and Swann and Powell would have decided to terminate him even in the absence of the protected conduct.

Therefore, the plaintiff was not wrongfully discharged for exercising his First Amendment rights so as to require remedial action.

*Failure to Follow City's Rules and Procedures*

■ "An agency of the government must scrupulously observe rules, regulations, or procedures which it has established. When it fails to do so, its action cannot stand and courts will strike it down." *United States v. Heffner,* 420 F.2d 809, 811 (4th Cir. 1970). *See also Service v. Dulles,* 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957); *Vitarelli v. Seaton,* 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959). Sumler asserts that the procedures in the "Work Policies and Procedures" section of the Winston-Salem City Employee Handbook were not followed because he was terminated for purchasing violations without having previously been suspended. However, the Handbook states that certain disciplinary action *"may"* be taken for certain conduct. Use of the word "may" allowed Swann and Powell discretion as to the action to be taken as a consequence of plaintiff's misconduct. The provision in the Handbook was not a mandatory directive always to be followed but instead was a guide in the imposition of disciplinary action.

■ The plaintiff also asserts that Swann and Powell failed to follow the rules and procedures contained in Section 20–17 of the Winston-Salem Code which required the department head (in the instant case, Swann) to give to the employee a statement of the reason for his dismissal, and which required a hearing on appeal to the City Manager (Powell). The plaintiff did receive his hearing pursuant to the City code. The hearing given Sumler was in the same form that Powell had given to previous appealing employees up to that time. Section 20–17 did not create or require a hearing with minimal procedural due process requisites simply by using the word "hearing," particularly in the context of the City code and prior action by Powell.

■ Swann sufficiently complied with the City code requiring a statement of reasons for dismissal. The plaintiff was given a written statement of the reason he was terminated: a memorandum from Swann to Sumler, dated February 3, 1975. The memorandum mentioned the principal factor for the discharge, plaintiff's purchase of the television sets. The memorandum also referred to plaintiff's questionable record, and though the specifics of such record were not listed, several factors constituting such record were discussed at the meetings with Swann and Powell. Even if the various factors making up plaintiff's questiona-

ble record were not adequately presented to him, the memorandum stating the major reason for dismissal was still sufficient to comply with the City code.

Therefore, Swann and Powell did not improperly fail to observe and follow rules, regulations, and procedures established by the City. *See also Board of Curators of University of Missouri v. Horowitz,* —— U.S. ——, ——, n.8, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978).

*Due Process Hearing*

The plaintiff did not have a hearing comporting with minimal procedural due process, *see Thomas v. Ward,* 374 F.Supp. 206, 211 (M.D.N.C.1973), nor did the plaintiff waive any right he might have had to a due process hearing. However, for plaintiff to have had such a right, he must establish that he was deprived of either a property interest or a liberty interest.

 Sumler did not have a property interest in his job. He had no written or oral contract of specific duration with the City nor did a statute or ordinance grant him tenure. The Winston-Salem City Code did state that an employee may be discharged "for cause." However, a "for cause" provision was present in the city ordinance involved in *Bishop v. Wood,* 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976), and no property interest was found there. Therefore, the presence of such a "for cause" provision did not by itself create a property interest. *See Banks v. Redevelopment Authority of Philadelphia,* 416 F.Supp. 72, 73 (E.D.Pa.1976).

Although an employee may have a binding understanding for continued employment (a de facto tenure) even in the absence of a formal contract, *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), plaintiff presented no credible evidence that he had a legally recognizable and legitimate expectation of continued employment. Under North Carolina law, plaintiff's employment was terminable at the will of either plaintiff or the City. *Nantz v. Employment Security Commission,* 290 N.C. 473, 226 S.E.2d 340 (1976);

*Bishop v. Wood,* 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976). Therefore, plaintiff had no property interest entitling him to a due process hearing.

 The Supreme Court has stated that a liberty interest might be implicated when an employer makes charges against an employee which might seriously damage his standing and associations in his community, such as accusations of dishonesty or immorality. *Board of Regents v. Roth,* 408 U.S. 564, 573, 92 S.Ct. 2701, 33 L.Ed.2d 548, 558 (1972). "Thus, 'liberty' is implicated and procedural due process is required when government action threatens an employee's good name, reputation, honor, or integrity. . . . [G]overnment dismissal may abridge liberty if it imposes a 'stigma or other disability' which forecloses a discharged employee's freedom to take advantage of other employment opportunities." *McNeill v. Butz,* 480 F.2d 314, 319 (4th Cir. 1973). The government must *publicly* accuse the discharged employee of dishonesty or similar conduct. *Bishop v. Wood,* 426 U.S. 341, 348, 96 S.C. 2074, 48 L.Ed.2d 684, 692 (1976).

The statement of the reason for plaintiff's termination which appeared in the newspapers on February 4 and 5, 1975, appears to be of such a nature as to possibly implicate a liberty interest. Although an accusation of "repeated use of City position to purchase items at discount for personal use" is not a classic charge of dishonesty, it does appear to imply conduct which is less than honest.

However, even if the statement of the reason for plaintiff's termination definitely charged dishonesty, no liberty interest would be raised if the plaintiff initiated and maintained publicity as to such reason for his discharge. *Fuller v. Laurens County School Dist. No. 56,* 563 F.2d 137, 141 (4th Cir. 1977). If Sumler was the first to tell the news media the reason for his discharge, and Swann merely responded and agreed to what plaintiff said, then no liberty interest would be raised. A discharged employee cannot create a liberty interest by

his own conduct. However, if the plaintiff had not told the newspaper reporters the reason for his discharge, and it was Swann who first told them that the reason for the dismissal was Sumler's repeated violations of purchasing procedures, then *Fuller* would be inapplicable and a liberty interest implicated.

The United States Supreme Court recently stated, in relation to the need for a due process hearing because of deprivation of a liberty interest, "[o]nly if the employer creates and disseminates a false and defamatory impression about the employee in connection with his termination is such a hearing required." *Codd v. Velger*, 429 U.S. 624, 627, 97 S.Ct. 882, 884, 51 L.Ed.2d 92, 97 (1977).

■ This Court did not find that Swann was the creator of the publicity and the disseminator of the reason for the termination, but did find as a fact that Sumler initially discussed his dismissal with the media. Therefore, no liberty interest was implicated. The plaintiff simply failed to carry his burden to prove that the defendants initiated public statements charging him with dishonesty or similar misconduct.

Because plaintiff was not deprived of a property or liberty interest, he had no constitutional right to a due process hearing.

■ Some of the incidents and complaints that constituted plaintiff's "questionable record" (which was a minor factor in Sumler's discharge) were not investigated by Swann or Powell. Although consideration of uninvestigated complaints and incidents may seem unfair to some people, there was no constitutional requirement in this case for Swann or Powell to investigate all complaints or charges. The United States Supreme Court has stated:

> The truth or falsity of the City Manager's statement determines whether or not his decision to discharge the petitioner was correct or prudent, but neither enhances nor diminishes petitioner's claim that his constitutionally protected interest in liberty has been impaired. A contrary evaluation of his contention would

enable every discharged employee to assert a constitutional claim merely by alleging that his former supervisor made a mistake.

> The federal court is not the appropriate forum in which to review the multitude of personnel decisions that are made daily by public agencies. We must accept the harsh fact that numerous individual mistakes are inevitable in the day-to-day administration of our affairs. The United States Constitution cannot feasibly be construed to require federal judicial review for every such error. . . . The Due Process Clause of the Fourteenth Amendment is not a guarantee against incorrect or ill-advised personnel decisions.

> *Bishop v. Wood*, 426 U.S. 341, 349–50, 96 S.Ct. 2074, 2086, 48 L.Ed.2d 684, 692–93 (1976).

*See also Megill v. Board of Regents of Florida*, 541 F.2d 1073, 1077 (5th Cir. 1976); *Fraternal Order of Police v. Township of Lower Merion*, 416 F.Supp. 65, 67–68 (E.D. Pa.1976).

The lack of investigations by Swann or Powell was not motivated by a constitutionally impermissible reason, such as race, and consideration of uninvestigated material by Swann and Powell did not deprive plaintiff of any constitutional right.

### Conclusions of Law

1. The Court has jurisdiction over the parties and over the subject matter.

2. The plaintiff has satisfied all of the jurisdictional prerequisites of Title VII of the Civil Rights Act of 1964.

3. The plaintiff was not wrongfully terminated because of his race, and the defendants did not violate Title VII of the Civil Rights Act.

4. The plaintiff was not wrongfully discharged for exercising his First Amendment rights so as to require remedial action.

5. The defendants, P. W. Swann and Orville Powell, did not improperly fail to observe and follow rules, regulations, and procedures established by the City.

6. The plaintiff was not wrongfully deprived of a constitutional right to a due process hearing; he had no such right under the facts in the instant case.

### Order

Upon the Findings of Fact and Conclusions of Law, it is ORDERED that the plaintiff recover nothing of the defendants and that this action be, and the same hereby is, DISMISSED. A judgment will be entered accordingly.