Benjamin WOOTEN, Plaintiff,

v.

NEW YORK TELEPHONE COMPANY, Defendant.

No. 75 Civ. 6386–CSH.

United States District Court,
S. D. New York.

Jan. 15, 1980.

Zoltan ·Neumark, New York City, for plaintiff.

Jay D. Harris, New York City, for defendant.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

Plaintiff Benjamin Wooten commenced this action against the New York Telephone Company (the "Company") pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* Wooten, who is black, claimed that the Company discharged him because of his race, in violation of 42 U.S.C. § 2000e–2(a)(1). He sought reinstatement and back pay.[1] After bench tri-

---

1. Early in the course of this litigation, plaintiff moved for leave to amend his complaint pursuant to Rule 15, F.R.Civ.P., so as to add to his Title VII claims a further cause of action under 42 U.S.C. § 1981 for personal injuries, resulting from the Company's alleged failure to give prompt medical attention to plaintiff's injured hand. This Court granted plaintiff's motion to amend in a memorandum dated November 19, 1976. No amended complaint was filed or served. By an endorsement to motion papers dated September 26, 1979, the Court *inter alia* denied plaintiff's demand for a ·jury "in this Title VII suit, which is essentially equitable in nature." Counsel was thus reminded that, in the absence of an amended complaint, only the

original Title VII claim was before the Court. The September 26, 1979 endorsement .advised counsel that the case would probably be reached for trial in early November. In point of fact, the case was called for trial on December 17. That morning counsel for plaintiff, still without having filed or served an amended complaint, sought leave to assert a personal injury claim, and demanded a jury trial in respect of it. Counsel for the Company pointed out that, in the absence of an amended complaint, the Company had not obtained appropriate discovery of plaintiff, such as a physical examination. The Company was understandably not ready to go to trial on a personal injury claim. While the circumstances would

al, the Court enters the following Findings of Fact, Discussion and Conclusions of Law, pursuant to Rule 52(a), F.R.Civ.P. For the reasons stated, the complaint is dismissed.

### FINDINGS OF FACT

The plaintiff, Benjamin Wooten, applied to the Company for employment in November, 1969. After he successfully passed some initial tests, the Company employed Wooten, and trained him as a frameman. Wooten was assigned to work at a Company facility at West 73rd Street and Broadway, in Manhattan. He was employed as a frameman until his discharge on August 9, 1974, under the circumstances to be related.

A telephone "frameman" works on a "frame," which is a complex of machinery bringing the Company's main cables together with the wires going to the telephones of individual consumers. Framemen perform a variety of functions in connection with the frame. Wooten was employed as a "loopman." The function of a loopman is to put on a head set, and plug in his equipment at various locations around the frame, following the instructions of a tester in order to locate troubles within the system. The job is known as "working the loops." A loopman's responsibilities are rather limited, the job is monotonous, and requires a lower level of training than other functions which framemen may perform, such as testing, the installation of new wires, repair, and working on the "cross-bars" which lie at the heart of the frame complex.

Subsequent to his employment in 1969, Wooten performed generally satisfactory work for the Company. An appraisal report dated April 9, 1973 (DXK) grades his job performance as satisfactory in four categories, although "unsatisfactory" in "reliability" and "attitude and conduct." However, an appraisal report dated May 16, 1974 gave Wooten a "satisfactory" rating in all six categories; and added the following remarks:

> "Ben does his assignments and his work is fairly good. With a little more experience and more training, Ben could become a fairly good frameman." (PX1).

During the weekend of July 6–7, 1974, Wooten injured his right hand playing baseball at home. In an earlier statement, Wooten said he was injured by the bat; at trial he testified that he was hit by the ball. The discrepancy is of no significance. Wooten reported to work on Monday, July 8. He worked the night shift at the 73rd Street facility, which ran from 4:00 p. m. to twelve midnight. When he reported on July 8, Wooten showed the third finger of his right hand, which was swollen and painful, to his foreman, Bertram Francks. Wooten told Francks that he needed medical assistance, and asked that he be sent to the Company medical department, which was housed in a separate Company building downtown. Francks declined to do so. There is a conflict in the testimony as to the reasons for Francks' position. Wooten testified that Francks simply stated he was short of men, and could not spare Wooten for a visit to the Company medical department. Francks testified that he explained to Wooten that, in the circumstances, the Company medical department would not treat Wooten's injury, and that Wooten should consult his own physician. I find that both factors were present in Francks' mind, and that he expressed both of them to Wooten. It is common ground that Wooten performed his regular duties as a frameman, without visiting the Company medical department or seeking out medical advice on his own, until July 17. On July 16, while Wooten was at work, a union shop steward advised Francks that Wooten's hand "looked bad," and recommended that Francks send Wooten to the Company

have warranted rejection of plaintiff's request out of hand, the Court was reluctant to penalize plaintiff for the oversight of his counsel. The parties were therefore advised that, if plaintiff wished to press a personal injury claim, the case would be continued so as to permit discovery and further trial preparation.

Counsel for plaintiff was instructed to take the plaintiff's instructions as to whether he wished such a continuance, or preferred to go ahead that day, in a non-jury trial limited to the Title VII claims. Plaintiff opted for the second alternative, and the trial proceeded.

medical department. Francks accepted that suggestion, instructing Wooten to report to the medical department at 4:00 p. m. on the following day, July 17.

During the period July 8 through July 16, Wooten was required to, and did, perform his regular duties as a frameman. I find, from the medical evidence, that the third finger on his right hand was infected and painful during this interval. Francks did not assign Wooten any light or restricted work during this period. As foreman, he had no authority to do so. Only the Company's medical department could certify an employee for light or restricted duty.

On July 17, Wooten presented himself at the Company medical department, where he was examined by a Dr. Harold Grande. Dr. Grande found that Wooten had an infected finger on the right hand. He advised Wooten to consult his own physician; gave him the rest of the day off; and advised Wooten that he would be expected to return to work on the following day, with restricted duty (Grande deposition, PX8, at p. 8).

In point of fact, Wooten did not report again for work prior to his discharge on August 9. Wooten testified, and I find, that subsequent to his examination by Dr. Grande on July 17, he undertook to find a private physician, eventually coming under the care of a Dr. Ambinder on about July 21. Wooten also reported again to the Company medical department on July 22, at which time Dr. Grande again examined him, and instructed him to return to work on restricted duty. Wooten returned to Dr. Grande's clinic on August 1, at which time he submitted a medical statement from Dr. Ambinder, to the effect that Wooten was unable to work "for a few weeks." Plaintiff had misplaced his written statement from Dr. Ambinder, and that physician was not called as a witness on the trial; but the substance of Dr. Ambinder's recommendation, and its date, July 24, appear from the Company's medical records on Wooten (PX2). Dr. Grande advised Wooten, on August 1, that he did not agree with Dr. Ambinder's evaluation, and, that while he was willing to have Wooten examined by

another Company physician, Dr. Grande was obliged, in the circumstances, to instruct Wooten again to report for restricted duty. (PX8 at p. 14). According to Dr. Grande's contemporaneous note (PX2), Wooten rejected that suggestion "strenuously"—Wooten felt "that what his doctor says is the last word. The visit ended on this impasse."

Wooten's supervisors at the 73rd Street facility made repeated efforts to contact Wooten by telephone at home, to urge him to report to work. On July 29, Daniel Lake, at that time a second line frame supervisor at the 73rd Street facility, and another supervisory individual named Entwistle visited Wooten at his home, and advised Wooten that there was work available for him on restricted duty, which would involve working with the left hand only. Lake testified that he advised Wooten specifically of the nature of such work: filing and answering the telephone. Wooten denies that he was given such specifics. In the view I take of the case, I need not resolve this discrepancy. Wooten did not return to work, apparently relying, as noted *ante*, upon the statement obtained from Dr. Ambinder that he should not work at all for a number of weeks.

Under date of August 5, 1974, R. K. Banta, the Company's district plant superintendent, sent Wooten a letter (PX3) which read in its entirety as follows:

"You are absent from the job without justification from our Medical Department.

"If you do not return to work by August 8, 1974, you will be subject to disciplinary action, which could lead to separation from the payroll."

Wooten acknowledges having received this letter. His response to it was to report again to the Company medical department, be examined again by Dr. Grande on the morning of August 9. In Wooten's presence, Dr. Grande reached Dr. Ambinder by telephone, and the two physicians discussed the situation. Dr. Grande testified at his deposition (p. 16), his contemporaneous notes confirm, and I find, that in that conversation Dr. Ambinder learned for the

first time that Wooten could be placed on restricted duty, involving work which did not require the use of his right hand. Dr. Ambinder agreed with Dr. Grande that, with this restriction, Wooten was able to work. Dr. Grande terminated the conversation, and advised Wooten of its substance. Dr. Grande's contemporaneous note (contained within the medical file, PX2) reflects Wooten's continued insistence that he could not work.

There is a conflict as to whether Dr. Grande spoke by telephone with superintendent Banta following these events of August 9. Banta testified that Grande had reported to him concerning his interview that day with Wooten, advising Banta that Grande had spoken to Wooten's physician, who concurred in Wooten's ability to work with restrictions. Dr. Grande, at his deposition, recalled no such conversation with Banta. Again I need not resolve the discrepancy. It is apparent that Banta had sufficient knowledge of the circumstances to dictate to his secretary a letter, advising Wooten that his employment had been terminated for failure to report to work. Banta, who was leaving early that day, instructed his secretary to contact Wooten's supervisor at 4:30 p. m. on August 9, and, if Wooten had not reported for the night shift, the letter was to be signed and mailed. Wooten did not report, and these instructions were followed. On August 12, Wooten, having received the letter, telephoned Banta and protested his discharge on the ground that his own physician had said that he could not work. Wooten made no charge, in that conversation, that his discharge had been racially motivated. Banta replied that he was bound by the findings and recommendations of the Company's medical department, and that the discharge would remain in effect.

The record contains no direct evidence, in the form of oral or written admission, that the Company was motivated by racial animus in discharging Wooten. That is hardly surprising. Wooten relies, instead, upon a series of circumstances, from which he contends that such animus should be inferred. The Court's findings with respect to those particular circumstances will now be set forth.

Wooten lays particular stress upon two incidents involving one James Irvine, a former Company foreman with whom Wooten came into unharmonious contact. I find the facts concerning the first Irvine incident to be as follows. In early 1974, Irvine was a foreman at the 73rd Street facility. He was assigned to the night shift, and supervised Wooten, among others. A foreman is a managerial, non-union position within the Company hierarchy, in contrast to framemen, testers, and others, who are craftsmen and union members. It came to pass that on an evening early in 1974 Irvine, his wife and another couple were having dinner at Gleason's Bar, an establishment in the vicinity of the 73rd Street facility which Irvine frequented. During the course of the evening, Wooten and John DeRiggs, another frameman (also black) on Wooten's shift, appeared in Gleason's. Words were exchanged between Irvine and Wooten; an altercation broke out; the disputants repaired to the sidewalk; and Irvine, during the course of the altercation, referred to Wooten as a "dirty nigger." When this unpleasant incident came to the attention, the next morning, of Lake, Irvine's immediate superior, he directed Irvine to apologize to DeRiggs and Wooten, in the presence of the entire night shift work force. Irvine made such an apology.

There is no dispute as to these particular facts. There is a conflict in the evidence concerning the circumstances of the arrival of Wooten and DeRiggs at Gleason's. Wooten testified that he and DeRiggs were on duty on the 4:00 p. m. to midnight shift, when they received two telephone calls from Lake, asking to speak to Irvine. While Irvine was the foreman on duty on that shift, he had left early, to meet his wife for dinner at Gleason's. Irvine testified that he was entitled to leave his position before midnight. Wooten testified that he and DeRiggs resolved to find Irvine and give him a message that Lake was trying to contact him; and that they proceeded, on this mission, directly to Glea-

son's, arriving there at about 11:45 p. m. DeRiggs, in his trial testimony, generally corroborated this account, except for the time that he and Wooten arrived at the bar, as to which point DeRiggs was entirely vague. Wooten testified that he tried to tell Irvine that Lake was trying to reach him, whereupon Irvine became abusive, and the altercation started. Irvine testified that Wooten and DeRiggs did not arrive at Gleason's until about 1:30 or 1:45 a. m. He acknowledges that Wooten and DeRiggs told him that Lake had tried to reach him twice by telephone. Irvine testified further that he replied that he would get in touch with Lake; and then offered to buy Wooten and DeRiggs a drink. They declined, according to Irvine's testimony; and Wooten then made an audible obscene remark with reference to Irvine's wife, which started the altercation.

The timing of the incident, as to which the testimony conflicts, is significant. Wooten filed a complaint, in respect of his discharge, with respect to the Equal Employment Opportunity Commission ("EEOC"). The Gleason's Bar incident was cited by Wooten in that proceeding as an example of Company racial animus. The EEOC, declining to find reasonable cause, stated in its determination of July 23, 1975, in respect of the Gleason's incident, that it was "reasonable to assume that the incident did not occur during working hours." DXG at p. 2. While Wooten denied at trial having received a copy of that determination, it is clear from his pre-trial deposition that he did so, and I so find. I further find that Wooten's testimony at trial, that he and DeRiggs went directly to Gleason's from the job site, arriving at the bar before twelve midnight, represents an effort on his part to bring the incident within what could be regarded as "working hours." I further find that Wooten's testimony at trial, on this point, cannot be accepted, and represents a transparent effort to avoid the quoted finding in the EEOC determination. In a written and notarized complaint which Wooten addressed to the Company on this incident (DXD), Wooten states in pertinent part:

"After work John and myself went to a club. Afterward we past [sic] a bar called Gleason's at 2:00 a. m. and saw Jim Ervine [sic] with Dennis Matchen shop steward."

I find, on the basis of this sworn, pre-EEOC statement, that Wooten and DeRiggs arrived at Gleason's at about 2:00 a. m., just as Irvine testified. The reasonable inference I draw from that fact is that, contrary to their testimony at trial, Wooten and DeRiggs were not concerned with advising Irvine of Lake's efforts to reach him as quickly as possible. It is apparent that Wooten and DeRiggs spent about two hours visiting clubs of their own choosing, after leaving work at about twelve midnight, before appearing at Gleason's at about 2:00 a. m. In these circumstances, I credit Irvine's account of the incident, rather than that of the plaintiff.

Lake interviewed Irvine about this incident, after Irvine reported it to him the next morning. In Lake's view, the incident had occurred off Company premises, off Company time, and was not job-related. Nonetheless, he instructed Irvine to apologize for his racial epithet, out of a general concern that such undercurrents not infect the harmony of his shift.

The second incident involving foreman Irvine occurred on June 8, 1974. Irvine, who testified that he was having marital difficulties at that time, and also acknowledged a drinking problem, went to Gleason's for lunch on June 8, remaining there for four hours and returning to the 73rd Street plant in an intoxicated condition. He there discovered DeRiggs and Alfonso Mitchell, another black frameman, sitting at the foreman's desk. Irvine directed abusive comments at DeRiggs and Mitchell, who replied in kind. An altercation developed, in which two white employees, a frameman named Maloney and a switchman named Walsh, became involved; Maloney and Walsh were also union stewards. Ultimately Irvine purported to discharge all four employees, demanded that they surrender their Company passes, and instructed them to leave the building.

This incident was promptly reported to the union, which informed Company management. The Company's investigation resulted in prompt reinstatement of the four individuals purportedly discharged by Irvine, and the demotion of Irvine from foreman (a managerial position) to frameman. The Company, in choosing demotion for Irvine rather than discharge, took into consideration the fact that Irvine's "record contains no previously recorded instances of drinking or negative conduct of any type in his five years as a foreman or previous five years as a frameman." Memorandum on Irvine's demotion, dated June 12, 1974, prepared by division plant superintendent C. G. Mahoney, DXI, at p. 3.

DeRiggs and Mitchell testified at trial that Irvine purported to fire only them, and that he did not fire either Maloney or Walsh, who were white. These witnesses also testified that Irvine gratuitously announced the firing of Wooten, although the latter was not even on the premises. Irvine testified that he did, indeed, purport to discharge DeRiggs, Mitchell, Maloney and Walsh; and that he said nothing about Wooten. I reject the testimony of plaintiff's witnesses and accept that of Irvine. The contemporaneous report of superintendent Mahoney, based upon a prompt Company investigation into the incident, reflects Irvine's concession that he lost control of himself "in his dealings with Mr. Mitchell, Mr. DeRiggs, Mr. Maloney, and Mr. Walsh, upon his return to the frame at 4:00 P.M. and did in fact, tell all four employees to surrender their passes stating that they were 'all fired.'" DXI at p. 3. Irvine's statement was given, and the Company memorandum memorializing it prepared, a month before the facts occurred which gave rise to this litigation. It strains credulity to imagine that Irvine, immediately after the incident, and when the extent of his punishment was still unknown, would have falsely accused himself of the drunken firing of two white employees who were also shop stewards of the union. It is equally unlike-

ly that Irvine would have purported to fire Wooten, who was not even on the scene. It is entirely apparent that Irvine, in an intoxicated state, lost control and directed his wrath at anyone within view, black or white alike. I can only conclude that the testimony of plaintiff's witnesses, DeRiggs and Mitchell, was tailored to reinforce the theory of this action.[2]

The next incident referred to in plaintiff's proof may be characterized as the "Hoe Avenue Transfer." The Company maintained another facility at Hoe Avenue, in the South Bronx. This was a ghetto area, with a high crime rate. Some time in 1973, about a year before Wooten's discharge, the Hoe Avenue facility required additional personnel. It is common ground that Wooten and DeRiggs were transferred from 73rd Street to Hoe Avenue, spending several months at the latter facility, before being transferred back to 73rd Street. Wooten and DeRiggs testified to their belief that they were singled out for transfer to this undesirable location solely on the basis of racial animus; and that in consequence of the transfer, they were prejudiced in respect of overtime that would have fallen to them, had they remained at 73rd Street throughout.

Irvine testified, for the Company, that he was in charge of arranging these transfers. When the need for additional personnel at Hoe Avenue developed, Irvine testified that he asked for volunteers from the entire 73rd Street frame force; and that Wooten and DeRiggs, on a Wednesday prior to the Monday when the transferees were to report to Hoe Avenue, volunteered to do so. On that Friday, Wooten and DeRiggs said to Irvine that they had learned the Hoe Avenue area was undesirable, and that they preferred not to go. Irvine testified that, by then, it was too late to order anyone else to go; and so he instructed Wooten and DeRiggs to report to Hoe Avenue on that Monday, which they did. The difficulty in changing work assignments, on that short

2. My use of the word "tailored" in this opinion relates only to my opinion of the testimony of witnesses, and is not intended and does not reflect in anywise on the attorney for the plaintiff.

notice, was corroborated by Lake, the second line supervisor, who was subsequently made aware of the fact that Wooten and DeRiggs were dissatisfied at Hoe Avenue, and wished to return to 73rd Street. While Lake had the authority to order other framemen to Hoe Avenue, and thereby return DeRiggs and Wooten to 73rd Street, he was content to leave these two employees at Hoe Avenue for a period of months.

Irvine and Lake conceded that, in consequence of their interval at Hoe Avenue, Wooten and DeRiggs fell behind on the distribution of overtime. However, they testified, and I find, that it was the Company's policy to achieve an equal, yearly distribution of overtime; and that an employee who, at any given time, had received less overtime than others in the work force would be assigned additional overtime until overall parity was achieved.

Again, the evidence is in conflict on a significant issue, and I must resolve the conflict on the basis of credibility. Wooten and DeRiggs deny that they ever volunteered to go to Hoe Avenue, testifying instead that they were simply directed to go. Wooten and DeRiggs, in their testimony, ascribed the fact that they were singled out to their race, together with management resentment over a number of grievances they had filed in the past.

For the reasons given *ante*, I am unable to accept certain aspects of the evidence given by Wooten and DeRiggs; I therefore approach their testimony on other points with a certain skepticism. However, I am inclined to accept their testimony that they did not volunteer for Hoe Avenue. The Hoe Avenue address was considerably farther away from the homes of both Wooten and DeRiggs. No reason is immediately apparent why they alone, of the entire 73rd Street work force, should have volunteered for this transfer. I accept DeRiggs' testimony that, after Irvine asked for volunteers, DeRiggs asked a union steward about the facilities at Hoe Avenue, and was not favorably impressed by what he heard. It is more likely that employees, situated at a facility closer to home, would make this sort of inquiry, before volunteering to accept a transfer. It is plausible that Irvine selected two employees whose past behavior, in respect of filing grievances, might have been a source of irritation. It is perfectly apparent that Lake was content to leave Wooten and DeRiggs at Hoe Avenue, despite their expressed dissatisfaction, for a longer period of time than was necessary.

In short, I find that Irvine singled out Wooten and DeRiggs for an involuntary transfer to Hoe Avenue, and Lake permitted them to remain there, for reasons founded in personality considerations, of which the race of these employees may have been a factor.

The other circumstances from which plaintiff asks the Court to draw an inference of racial animus in respect of his discharge do not involve specific incidents; rather, they have to do with general policies to which plaintiff's witnesses testified. Plaintiff contends that the Company made it a practice of limiting black and Hispanic framemen to work on the loops, disregarding the repeated requests of members of these minority groups for training in other functions which are performed by framemen. This discriminatory policy in job assignment and training, it is said, deprived the affected employees of advancement possibilities, and overtime opportunities. Plaintiff also contends that only the black framemen (with the exception of one white frameman, who was reputed to be "gay") were assigned to sweep up the floors at the bottom of the frame. Finally, a general inequity of overtime distribution is alleged.

There is no evidence of any substance as to a racially inspired overtime imbalance, except to the extent that disparity in training led to disparity in overtime. As to the issue raised about sweeping, I find from the evidence adduced by both parties that all framemen had sweeping and house cleaning duties within the immediate areas of their labors. Thus, framemen who worked in the exalted and more challenging area of the "cross bar 5" were expected to clean up where they had been working; the same applied to framemen who were installing

new lines. The foremen at the 73rd Street facility had a policy of requiring the loopmen to clean the floor level of the frame; this usually involved sweeping, since rather long sections of wire would find their way on to the floor, and it was easier to sweep them up with a broom than to collect them by hand. I further find that white loopmen, as well as black loopmen, performed sweeping functions at 73rd Street.

I also find, however, that at one time the Company's policy in respect of job assignments gave rise to substantial and serious complaints by minority group employees. Evidence on this point was given by plaintiff's witness Dennis Serrette, a black employee of the Company since 1963, who has risen to the high crafts status of switchman, and has also been active in union affairs, serving five years as vice president of his Communications Workers of America local. I found Serrette to be a fair-minded and wholly reliable witness, and base my findings in the next four paragraphs upon his testimony.

Prior to 1967, the Company had done little hiring from minority groups. The first substantial hiring of blacks and Hispanics occurred in that year. In the period 1970 to 1974, the impact of those minority hirings began to be felt. Many blacks and Hispanics had been hired for work on the frames. Once there, the Company assigned them to the loops; and did not train them to perform other functions falling within the frameman category. In consequence, the minority group framemen were at a disadvantage in respect of skills, diversified overtime, and opportunities for promotion and advancement. This situation led to widespread dissatisfaction among the black framemen. In 1970, a walkout of all black framemen affected two Company buildings. Numerous grievances were filed on the question, under the collective bargaining machinery. Serrette participated in these protests, and in 1970 received a ten-day suspension, which he ascribes to his race and his activities in addressing this particular problem.

Eventually the objections had an impact of their own. A consent decree was generated by an EEOC and court proceeding in January, 1973. The details of that proceeding do not appear in the present record; but it resulted in the payment of reparations by the Company to victims of the policy, and the upgrading of women and minority group members within the work force. During the years 1972 and 1973, the Company had started upgrading blacks; during that period, Serrette testified, blacks began to be promoted to such positions as switchmen, and black employees were also elevated to foremen.

In July and August of 1974, when the events attendant upon Wooten's discharge occurred, there had thus been a change in the Company's previous, rigid, and quite indefensible policy of restricting black framemen to the loops. However, it is also fair to assume that the bitter aftermath of the earlier policy lived on; and that, in certain areas of the Company's activities, the transition was not yet complete. Undoubtedly, black framemen in mid-1974 were still resentful of the inequities of the recent past; and pockets of resistance to reform undoubtedly remained among lower and middle management personnel.

However, I am persuaded by Serrette's testimony that the winds of change were blowing with sufficient force, in mid-1974, to negate the assumption that, because black framemen had been treated unfairly by the Company, Wooten's discharge was necessarily promptly by racial animus. The Court's finding as to the cause of discharge must be based upon consideration of all the circumstances, as revealed by the evidence.

I find, on all the evidence, that Wooten was discharged for the reason articulated by the Company: his failure to report for work on the afternoon of August 9, in accordance with the medical department's clearance for restricted duty, not involving the use of his injured right hand. The direct evidence of Banta on this point is corroborated by a number of circumstances.

First, I find on the basis of Serrette's testimony that conflicts in advice given by

Company doctors on the one hand, and private physicians of employees on the other, gave rise to a wholly independent dispute between the Company and the union. The union's position was that an employee, directed by his physician to take certain steps or stay home from work, was entitled to rely upon that medical advice, although also obligated to keep medical appointments with the Company physicians. The Company took the position that the evaluations of its own physicians were binding on the employees, who must abide by them, notwithstanding contrary advice from their own physicians. The union considered this position to be unfair, apparently regarding the Company doctors as Company representatives first, and physicians second, the oath of Hippocrates to the contrary notwithstanding. This conflict generated considerable tension. The Company, according to Serrette, adhered to its position. Evidence of that adherence is found in proof offered by the Company at trial, to the effect that two white employees were discharged for refusal to report to work, in reliance upon evaluations of private physicians, after having been cleared for duty by the Company medical department. These are John Barci, an installer who was discharged for being absent without leave in July of 1973; and Mildred Tannenbaum, a telephone operator who was discharged in comparable circumstances in July, 1978. Stanley W. Johnson, a Company division staff manager for operations (and who happens to be black) testified, and I find, that discharges arising out of failure to report for work, complicated by conflicting medical advice, were not unusual, and that the Company's position in such cases reflected adherence to its basic policy.

It is also significant that the decision to discharge Wooten was made by superintendent Banta and his immediate superior, Mahoney. Wooten undoubtedly had difficulties with two foremen, Irvine and Francks, and to a lesser degree, with the second line foreman, Lake. But Irvine played no part in the events leading up to Wooten's discharge, having been demoted from foreman two months earlier.

Francks, while still a foreman, played no part in the decision to discharge Wooten. Banta consulted Lake, but Lake's contribution was not significant in the decision-making process, which had its origin in Banta's conclusion that Wooten's absence from the job, since July 8, was not justified, in the light of the Company medical department's conclusion that Wooten could perform restricted duties. It was this conclusion which prompted Banta's warning letter to Wooten of August 5, and the letter of termination on August 9, triggered by Wooten's failure to report to the evening shift on that day.

Much evidence was offered on the question of whether or not Wooten could have performed the filing duties which the Company witnesses testified were available for him, on a restricted basis. I need not resolve that issue. DeRiggs testified that when he had suffered an injury, and was cleared for light duty by the Company medical department, he reported for work, although because of his restrictions he "didn't do much of anything." If a Company doctor clears an employee to work, with restrictions, obligations fall upon both parties: the employee must report upon risk of being discharged for failure to do so; but if he reports, the Company is obligated to pay him his full wage, even if the restrictions substantially curtail his usefulness.

I find that, if Wooten had reported to the evening shift on August 9, he would have been received back to the work force at the 73rd Street facility, and given employment. I further find that the Banta letter of termination would not, in those circumstances, have been sent. Wooten's contention that he had been effectively discharged, for racial reasons, prior to that date is unsupported by the evidence, and I reject it. There is no basis in the evidence for finding that Banta and Mahoney, who made the decision to discharge Wooten in the circumstances revealed by the evidence, were motivated by racial animus.

Following Wooten's discharge, the Company did not replace him. I base that finding upon the deposition testimony of An-

nette Nolan, a Company executive concerned with hiring. Ms. Nolan testified, and I find, that as the result of recent technical developments in the industry, "the frame group is a shrinking force," which would probably be entirely done away with in a few years. The Company's policy is to upgrade framemen to other jobs. Nobody has been hired as a frameman since 1974. The Company is not presently hiring framemen. According to Ms. Nolan's records, only one employee has been upgraded to frameman since 1974: a black female, upgraded from "technical services" to frameman (or "frame person") in the spring of 1975. She replaced a frameman named Jay Nowicki; the frameman position held by Wooten was not filled.

## DISCUSSION

### A. Plaintiff's Prima Facie Case.

The Company argued, at the conclusion of plaintiff's evidence, that the complaint should be dismissed for failure to make out a *prima facie* case. The Company relied upon the elements of a *prima facie* case as enunciated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973), where racial discrimination in hiring was alleged, the *McDonnell Douglas* formula having been applied by the Second Circuit to a discharge case in *Powell v. Syracuse University*, 580 F.2d 1150 (2d Cir. 1978). In *McDonnell Douglas*, the Court said:

"The complainant in a Title VII trial must carry the initial burden under the statute of establishing a prima facie case of racial discrimination. This may be done by showing (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications . . . The burden then must shift to the employer to articulate some

legitimate, nondiscriminatory reason for the employee' rejection."

The plaintiff in *Powell* was denied tenure, and dismissed from her position on defendant's faculty. The district court and the Second Circuit both applied the *McDonnell Douglas* formula to the case of plaintiff's discharge. The district court concluded that plaintiff had failed to make out a *prima facie* case of discrimination because, *inter alia*, she failed to demonstrate "that other individuals possessing similar qualifications were hired after Powell was fired." 580 F.2d at 1155. The Second Circuit, reversing on that point, held that the hiring of a white female to teach the plaintiff's former course, over two years after plaintiff's discharge, was nonetheless, within the context of university employment, sufficiently recent to constitute a "replacement" of plaintiff, thereby satisfying the fourth element of the *McDonnell Douglas prima facie* formula.

In the case at bar, the defendant telephone company argued at the end of plaintiff's case, and reiterates now, that plaintiff Wooten entirely failed to prove that his position of frameman remained open, or that he was replaced by an individual of other racial characteristics. The Company relies upon the Nolan deposition, referred to *ante*, which establishes that Wooten's position as a frameman was not filled, and that the Company was not hiring framemen during the period subsequent to Wooten's discharge. This combination of proof and lack of proof, the Company contends, requires dismissal of the complaint, under the *McDonnell Douglas* formula as applied to discharge cases in *Powell*.

That argument, carried to its logical conclusion, would exempt from coverage under Title VII an employer who, in furtherance of a broad-based policy of employment discrimination, discharges its ten black employees, retains its 90 white employees, and, by virtue of making further overtime available to the remaining employees, finds it unnecessary to replace any of the discharged black employees. But I would be reluctant to accept such a theory; and, in

view of the Supreme Court's own references to the *McDonnell Douglas* formula, I need not do so. *McDonnell Douglas* itself recognizes that the facts "necessarily will vary in Title VII cases, and the specification . . . of the prima facie proof required from respondent is not necessarily applicable in every circumstance to differing factual situations." 411 U.S. at 802 n. 13, 93 S.Ct. at 1824 n. 13. In *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 358, 97 S.Ct. 1843, 1866, 52 L.Ed.2d 396 (1977), the Court observed that its decision in *McDonnell Douglas* "did not purport to create an inflexible formulation." "The importance of *McDonnell Douglas* lies," the *Teamsters* Court continued, "not in its specification of the discrete elements of proof there required, but in its recognition of the general principle that any Title VII plaintiff must carry the initial burden of offering evidence adequate to create an inference that an employment decision was based on a discriminatory criterion illegal under the Act." *Id.* at 358, 97 S.Ct. at 1866. See also *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 575–76, 98 S.Ct. 2943, 2948–2949, 57 L.Ed.2d 957 (1978).

In *Teamsters, supra,* the government instituted litigation under Title VII against a nationwide common carrier of motor freight, and a union representing a large group of the company's employees. The government alleged that the company had engaged in a pattern or a practice of discriminating against minority group employees, who were hired in lower paying, less desirable jobs than the positions which went to white employees. In considering what proof was necessary to constitute a *prima facie* case, the Court in *Teamsters* cited and quoted from *Franks v. Bowman Transportation Co.*, 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976), a class action in which plaintiffs proved that the company in question "had engaged in a pattern of racial discrimination in various company policies, including the hiring, transfer, and discharge of employees." *Id.* at 751, 96 S.Ct. at 1257. Although the trial court found that such a pattern had been proved, it denied seniority relief to certain members of the class, be-

cause not every individual had shown that he was qualified for the job sought, and that a vacancy had been available. The Supreme Court in *Franks* held that the trial court had erred in placing such a burden on the individual plaintiffs. Its rationale was that by "demonstrating the existence of a discriminatory hiring pattern and practice," the plaintiffs had made out a *prima facie* case of discrimination against the individual class members; the burden therefore shifted to the employer "to prove that individuals who reapply were not in fact victims of previous hiring discrimination." *Id.* at 772, 96 S.Ct. at 1260. Building from the *Franks* opinion, the *Teamsters* Court stated:

"The proof of the pattern of practice supports an inference that any particular employment decision, during the period in which the discriminatory policy was in force, was made in pursuit of that policy. The Government need only show that an alleged individual discriminatee unsuccessfully applied for a job and therefore was a potential victim of the proved discrimination. As in *Franks*, the burden then rests on the employer to demonstrate that the individual applicant was denied an employment opportunity for lawful reasons." 431 U.S. at 362, 97 S.Ct. at 1868.

While the case at bar does not involve a class action, or litigation instituted by the government, at least one court has suggested that the *Teamsters* rationale furnishes an alternative basis for a *prima facie* showing, in a case brought by an individual for allegedly wrongful discharge. In *Sumler v. City of Winston-Salem*, 448 F.Supp. 519 (M.D.N.C.1978), the court observed that the discharged plaintiff, a black, had not made out a *prima facie* case under the *McDonnell Douglas* formula because plaintiff "was not replaced with a non-black;. his position with the Recreation Department was never filled after his discharge." *Id.* at 527. The court then proceeded to say, however:

"If a plaintiff can show a past and present practice of general discrimination against blacks, then this may be sufficient for a prima facie showing. The

Supreme Court recently said that 'proof of the pattern or practice [of discrimination] supports an inference that *any particular employment decision*, during the period in which the discriminatory policy was in force, was made in pursuit of that policy.' *Teamsters v. United States*, 431 U.S. 324, 362, 97 S.Ct. 1843, 1868, 52 L.Ed.2d 396, 431 (1977) (emphasis added)." *Ibid.*

■ In accordance with this authority, I hold that it is not necessary for a plaintiff, in each and every discharge case, to establish replacement efforts in order to make out a *prima facie* case. I do not read *Powell* to require so rigid and inflexible a result. *Powell* turned on its own facts; the plaintiff there apparently made no effort to prove a longstanding pattern or practice, which might support an inference that the particular employment decision made in her case was in furtherance of an impermissible policy. In the case at bar, by contrast, that is in essence what plaintiff undertook to do. Defendant's motion at the end of plaintiff's case failed because, viewing the evidence in the light most favorable to plaintiff, there was a case for the Company to answer.

**B.** *The Reason for Discharge Articulated by the Company.*

Following denial of its motion to dismiss at the end of plaintiff's case, the Company undertook "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824. That reason, as we have seen, was Wooten's failure to report for work after having been certified for restricted duty by the Company medical department.

■ Under *Board of Trustees of Keene State College v. Sweeney*, 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978), a self-styled "per curiam" opinion which inspired four dissents, it would appear that all the employer need do, in order to "articulate" a nondiscriminatory reason, is to say what it is. Certainly it is clear, under the line of cases beginning with *McDonnell Douglas*, leading through *Furnco*, and culminating in

*Sweeney*, that the employer does not have the burden of proving a nondiscriminatory reason. Once such a reason is "articulated," it is the plaintiff's burden to prove that the articulated reason was a pretext.

■ As a practical matter, the "articulation" of a proposition of fact in litigation invariably takes the form of some sort of proof. In the case at bar, the Company offered considerable proof in support of its articulated reason for discharging plaintiff. The decisive issue is whether plaintiff has sustained his burden of proving that articulated reason to have been a pretext. I hold that plaintiff has entirely failed to sustain that burden.

■ In essence, that is because the several factors upon which plaintiff relies, considered singly or in concert, do not lead to the required inference. For example, the contrast plaintiff seeks to draw between the demotion of Irvine and his own discharge does not withstand analysis. I accept the principle that an employer's disciplinary rules and procedures may not be utilized, for reasons of racial animus, to bring about disparate results. However, the principle is not applicable if the incidents sought to be contrasted are not comparable. That is the holding of *Kendrick v. Commission of Zoological Subdistrict*, 565 F.2d 524, 527 (8th Cir. 1977), in which a black employee, discharged for fighting, asked the court to infer racial animus from the fact that two white employees got into a fight several months later and were not discharged. The Eighth Circuit accepted the district court's conclusion that the incidents were not comparable, adding the observation that "an employer has some discretion to consider all the facts and determine whether the discharge is an appropriate remedy or whether a milder punishment would be more appropriate." *Id.* at 527.

So too, in the case at bar, the incidents involving Irvine and Wooten are not comparable. While on the job site, Irvine behaved in a manner which disqualified him from further managerial responsibility. After serving as a craftsman for five years, Irvine

had been a foreman for another five years; that managerial status was lost as the result of his intoxicated condition and abuse of four employees (two black, two white). Irvine was reduced in position to that of a frameman. While he has subsequently been elevated to the position of tester, one of the highest craft designations, he has not, five and one-half years after the incident in question, been returned to managerial status; and his prospects in that regard must surely be viewed as uncertain. Irvine's demotion from managerial rank constituted a severe penalty. To be sure, a discharge would have been more severe; but the Company was entitled to take into consideration Irvine's ten years of service, unblemished (at least to the Company's knowledge) by any prior, similar act.

Wooten's discharge resulted not from a transgression while on the job, but from his persistent refusal to report to work at all. Whether or not the Company should have discharged Wooten, in all the circumstances, is not the issue, at least in this Court. The point is that the circumstances of Irvine's demotion form no basis for an inference that Wooten's discharge was prompted by racial considerations.

■ An employer is entitled to regard an employee's refusal to report to work in response to the medical evaluation of the company's doctors as insubordination, particularly where, as here, the evidence shows that the employee's own physician agreed with that evaluation. Cf. *Naraine v. Western Electric Co., Inc.,* 507 F.2d 590, 592–3 (8th Cir. 1974). In the case at bar, the Company's evidence indicates that Dr. Ambinder, Wooten's physician, concurred by telephone with Dr. Grande that Wooten could report, on restricted duty, for the afternoon shift on August 9. While Dr. Ambinder was subject to the plaintiff's trial subpoena—indeed, the physician communicated twice by telephone with Chambers with respect to his appearance—plaintiff ultimately chose not to call him, an omission which permits the inference that Dr. Ambinder would not have given contrary testimony on the point. An employer is also entitled to regard a failure to report for work as ordered as a ground for discharge. *Barnes v. St. Catherine's Hospital,* 563 F.2d 324 (7th Cir. 1977).

■ Even if I were to accept plaintiff's contentions that Company personnel did not advise him of the restricted work which he could perform, or that in fact he could not have performed such work as filing, this would not justify his failure to report on August 9. Supervisory personnel such as Lake are under no obligation to define in detail the nature of restricted duties, or to exercise the art of advocacy in persuading an employee to give favorable consideration to such work. It is sufficient for management to advise the employee of the existence of restricted duty, and require the employee's attendance at the job site. If the employee, having reported, cannot in fact be usefully employed, he is entitled to salary, and the company bears the loss.

■ For reasons partially stated *ante,* the Company's asserted policy with respect to the non-training of black framemen is not sufficient to sustain plaintiff's burden of proof. By mid-1974 reform of that policy had made substantial progress. Indeed, two of three black employees called as witnesses by plaintiff have advanced in the Company. DeRiggs has been advanced to the position of senior frameman, a position of considerable responsibility and versatility. Serrette has progressed from frameman to switchman, one of the highest craft classifications. In summation, counsel for the Company contrasted the situations of DeRiggs and Wooten: DeRiggs, following an injury, had reported as instructed for restricted duty, and was still with the Company, in an elevated position; Wooten, having refused to follow such instructions, had been discharged. Plaintiff's counsel argued in reply that DeRiggs was still with the Company only because the Company had not yet been presented with a pretext for discharging him. This conjectural argument, born of suspicion, does not rise to the level of proof, no matter how sincerely the suspicion may be felt.

Mr. Wooten quite clearly believes that he was discharged because of his race. I am prepared to accept the sincerity of that belief, particularly when one reflects upon man's unlimited capacity to rationalize events, so that his own responsibility diminishes, and others emerge as villains. But plaintiff has simply failed to sustain his burden of proving that the Company's articulated reason for his discharge was a pretext, and that the discharge was in fact prompted by racial animus.[3] In consequence, the complaint must be dismissed.

■ That dismissal will be with prejudice, but, in the exercise of my discretion, without costs. Following his discharge, Mr. Wooten was unemployed for a considerable period of time, and has now succeeded in finding employment only as a messenger, at a salary of $120 per week. I am entitled to consider the parties' widely differing financial resources in ruling upon an application for costs and fees. The Company's application for an award of attorney's fees is denied.

### CONCLUSIONS OF LAW

1. This Court has jurisdiction over the parties and the subject matter of this action.

2. Plaintiff has failed to sustain his burden of proving that the defendant Company discharged him because of his race.

3. The Clerk of the Court is directed to enter an order dismissing the complaint, with prejudice and without costs.

It is So Ordered.

---

**3.** The only racial animus I have found in the record relates to the "Hoe Avenue Transfer"; see pp. 754–755, *ante.* However, that incident is not pertinent to the reasons for Wooten's discharge, because the foreman involved—Francks and Lake—did not make the subsequent decision to discharge Wooten.