Janet STOREY

v.

**CITY OF SPARTA POLICE DEPARTMENT, Bob Breeding, Robert Agee, Alvin Carter, Tim Kentner, W.C. Turner, James Vaughn, Mike Wilson, Daniel Elsberry, and Hugh M. Carmichael, II.**

No. 2–85–0125.

United States District Court,
M.D. Tennessee,
Northeastern Division.

May 26, 1987.

Jere L. Hargrove, William Allen, Rural Legal Services of Tennessee, Cookeville, Tenn., for plaintiff.

Ernest D. Bennett, III, Sparta, Tenn., for defendants.

## MEMORANDUM

MORTON, Senior District Judge.

This is an action brought pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.,* the Civil Rights Act of 1866, 42 U.S.C. §§ 1981 and 1983, and the fourteenth amendment to the United States Constitution, alleging sexual and racial discrimination against the City of Sparta Police Department and a number of city officials for failing to hire the plaintiff. Additionally, the plaintiff claims retaliatory failure to hire in violation of 42 U.S.C. § 2000e–3(a), because she had suggested she would file an EEOC com-

plaint for sexual and racial discrimination if she were rejected. The defendants deny the allegations and assert that the plaintiff was not hired because there were no available vacancies on the Sparta Police Department at the time of the plaintiff's application in August of 1984 and that when they finally hired male officers in April and September of 1986, the men hired were better qualified than the plaintiff. Since a moratorium on hiring police officers existed for approximately 18 months, the defendants contend that the plaintiff is unable to establish a prima facie case. The City of Sparta submits that after it received the plaintiff's application, "the idea of hiring a person as a police officer at that time just died." For the reasons set forth in the following findings of fact and conclusions of law, Fed.R.Civ.P. 52, judgment shall be entered in favor of the plaintiff against the City of Sparta and the named individual defendants who were Sparta city officials on or before March 11, 1986. They are liable for unlawful discriminatory and retaliatory acts in their official capacity as agents of the City of Sparta and therefore as "employers." 42 U.S.C. § 2000e(b). Injunctive relief is awarded against all named defendants.

I.

The court has jurisdiction of this case pursuant to the provisions of 42 U.S.C. § 2000e *et seq.,* all jurisdictional prerequisites having been fulfilled.

On August 7, 1984, the plaintiff, a 36-year-old female, applied for a position as a police officer with the City of Sparta Police Department in Sparta, Tennessee. On August 15, 1984, she was interviewed by then-Chief of Police Ernest Cotten, Jr., who told her that she was the most qualified applicant they had,[1] the only one with any college education, but that there might be an "attitude problem" with some of the city aldermen concerning hiring a female as a police officer. Chief Cotten told the plain-

---

**1.** The parties have stipulated that the plaintiff met the minimum qualifications for a police officer. She graduated from Clark College in Vancouver, Washington, in 1983 with an associ- ate degree in administration of justice. Her overall grade point average was 3.3 with a 3.8 in her criminal justice studies. She is not a certified police officer.

tiff he currently had two openings in the budget for police officers and that he might be able to employ her as early as the middle of October. On October 3, 1984, however, Chief Cotten told the plaintiff he could not hire her because she was a woman, and women were not considered as minorities for the purposes of affirmative action.[2] She contacted the city administrator, Hugh Carmichael II, and informed him that she wished to speak with the Sparta City Council.

Ms. Storey maintains that she is an American Indian. Because she felt she constituted two minorities (sex and race), she wished to inform the board of her race. Although Ms. Storey has the appearance of an American Indian, she did not otherwise verify her race nor does she seek relief on the basis of racial discrimination. Therefore, the alleged violations of 42 U.S.C. § 1981 will not be addressed.

The city administrator advised her not to attend the October 4, 1984, meeting of the Sparta Mayor and Board of Aldermen, and she heeded his advice. However, Ms. Storey attended the October 14, 1984, meeting of the Mayor and Board of Aldermen and presented her qualifications. At the meeting, Chief Cotten recommended William Floyd Cartwright, a black male, for employment as a police officer. The recommendation was opposed by one or more of the aldermen, apparently because Mr. Cartwright had voluntarily quit his job with the Sparta Police Department in the past. Alderman Robert Agee suggested to the board that the City hire some minorities and employ them long enough to secure their federal grant money before dismissing them during their probationary period.

A decision was made to advertise the vacant police officer position and hire someone at the November meeting.[3] Chief Cotten and City Administrator Carmichael were asked to select the three most qualified applicants and recommend them to the board at the next meeting. Chief Cotten did not recommend Janet Storey for the police officer position at that meeting or at any time thereafter.

The plaintiff filed an EEOC complaint alleging sexual and racial discrimination on October 23, 1984. The plaintiff was granted an interview with Chief Cotten and Administrator Carmichael[4] on October 31, 1984. During the interview, Ms. Storey was informed that a female police officer would be a first for Sparta and was questioned about how her husband might feel about her riding in a car with male officers.

Three applications were received in response to the advertisement, one of which was accepted on November 2, 1984. Five other applications were received between September 24, 1984, and October 17, 1984, presumably by word-of-mouth recruiting. Chief Cotten did not interview any of these applicants.

At the November 1, 1984, meeting of the board, no mention was made of hiring for the police department. Although Chief Cotten attended the meeting, he was never asked to report on his search for qualified applicants, nor did he seek recognition for that purpose. Chief Cotten admitted that he could obtain the floor at board meetings anytime he desired. The idea of hiring a police officer to fill the vacancy or vacancies which existed[5] seems to have vanished into thin air.

2. The City was notified in September 1984 of a pending recommendation by the Knoxville regional office of HUD that its UDAG eligibility be decertified due to underrepresentation of minorities in its work force. HUD did not specify that the minority hiring take place in any particular department of the city.

3. This was the first time the City of Sparta had advertised a vacancy in city government. Administrator Carmichael, who began working for the City in April 1984, is responsible for implementing this change. The open position was advertised on October 23 and 30, 1984, in *The*

*Sparta Expositor*, a local newspaper, noting a deadline date for applications of 12:00 Noon, November 1, 1984.

4. Mr. Carmichael did not customarily attend Chief Cotten's interviews. He attempted to explain this disparity by saying that he took part in this interview because she was a good applicant.

5. At *least* one vacancy existed. According to the city payroll records, after Mr. Cartwright resigned, the number of officers fell from 14 to 13 and never reached 14 again until George Bar-

Chief Cotten testified that he did not consider his department fully staffed at the time of Ms. Storey's interview. Mr. Carmichael admitted that in October 1984 Chief Cotten needed more officers—that the Chief told him that "about every morning." As of November 2, 1984, $85,643.37 remained in the county coffers as unappropriated funds. During the two-week pay period ending November 6, 1984 (when the plaintiff was rejected due, ostensibly, to no vacancy), a total of 46 hours of overtime was reported by Sparta police officers. In the following 16 months, there were only 3 pay periods in which no overtime hours were reported, and over 100 hours of overtime are shown in 4 pay periods. The average number of overtime hours worked per pay period is 46 hours. Beginning in July 1985, officers were paid 1½ times their regular hourly rate for overtime work; prior to that, the compensation was their regular hourly rate. Despite the inordinate amount of overtime, no one was hired until more than 15 months later— February 20, 1986.

On March 8, 1985, Chief Cotten resigned. He was replaced by Assistant Chief Carl Dilldine, who was promoted within the department. At that point the police force fell to 12 men. Two weeks later the count was down to 11, when Officer Measles did not work for approximately six pay periods. On January 2, 1986, Chief Dilldine resigned as chief of police, requesting to be retained as assistant chief. The City of Sparta advertised the vacancy of police chief. Several applications were received in response, and on February 20, 1986, Daniel E. Elsberry was hired as police chief. On January 24, 1986, the plaintiff applied for the position as chief, noting on the application that she was also interested in a job as a police officer. She does not contend, however, that the hiring of Chief Elsberry was an act of discrimination against her.

Sergeant Glenn Price was required to take a leave of absence effective February 9, 1986, in order to run his campaign for White County Sheriff. At the March 6, 1986, meeting of the board, Mr. Carmichael suggested the employment of a temporary police officer to relieve the need for additional manpower and the aldermen agreed. For the first time, they conditioned the hiring of a police officer upon the requirement that the applicant be a certified officer or able to be certified through transfer from other jurisdictions.[6] Additionally, they were careful to note that any prospective employee should be told that no preference could be given to them for possible future full-time positions. A female, Bonnie S. Anderson, had applied and been interviewed for the position as police chief less than two months earlier. She was hired as the temporary police officer on March 11, 1986, and worked until mid-August 1986. She was reemployed on temporary status on December 1, 1986. As a temporary employee she is entitled to fewer fringe benefits than the permanent male officers. Additionally, the temporary position has a salary of about $50 less per pay period than the comparable permanent position. The plaintiff does not contend that the hiring of Officer Anderson was discriminatory.

Nine days after the Sparta Police Department had hired its first female officer and given her a temporary position to alleviate the shortage, the board again discussed the need for an additional police officer to improve the overtime and manpower situation. At the March 20, 1986, board meeting, a decision was made to hire a permanent police officer. No mention was made of hiring only certified officers, and not all of the interviewees were certified. The City advertised the vacancy on March 24 and 31, 1986. The plaintiff was notified by mail, and she telephoned confirming her interest in the position on March 26, 1986.

told, Jr., was hired in April 1986. The extra position was absorbed in overtime hours, as addressed *infra.*

**6.** A police officer becomes certified after completing the training academy program in Donel-

son, Tennessee. Twelve of the fifteen Sparta police officers received certification *after* the date of their hiring. In June 1984 (5 months before the plaintiff's rejection) an uncertified officer, McCormick, had been hired.

George Bartold, a seasoned police officer with 18 years' police experience and certification from the State of Florida, was hired on April 3, 1986. The city budget was amended to provide Officer Bartold's salary.

On September 4, 1986, James O'Conner was hired to replace an officer who had resigned to take a position with the White County Sheriff's Department. Mr. O'Conner had been employed as a deputy sheriff in White County for 8½ years, having received certification as a police officer in 1979. Both Bartold and O'Conner are white males. The plaintiff was never offered a position as a police officer. She contends that her initial rejection on November 1, 1984, and the hirings of Bartold and O'Conner were acts of sexual discrimination and that the failure to hire her was in retaliation for her EEOC complaint.

## II.

The framework for establishing a prima facie case of discrimination is set forth in the oft-cited case of *McDonnell Douglas Corporation v. Green* [7] and consists of the following elements (adapted to sexual discrimination):

1. that the plaintiff is female;
2. that she applied and was qualified for a job for which the employer was seeking applicants;
3. that, despite her qualifications, she was rejected; and
4. that, after her rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

Once the plaintiff meets the initial burden of proving a prima facie case, the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for the plaintiff's rejection. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824; *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981). If the employer does

this, the plaintiff has the burden of proving that the articulated reason was false or pretextual. *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095. The ultimate burden of persuading the trier of fact that the defendants intentionally discriminated against the plaintiff regarding the particular employment decision "remains at all times with the plaintiff," *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093, and in the final analysis, the trier of fact "must decide which party's explanation of the employer's motivation it believes." *United States Postal Service Board of Governors v. Aikens,* 460 U.S. 711, 716, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983). The standard for establishing a prima facie case is not inflexible, as the facts necessarily will vary in Title VII cases. *Burdine,* 450 U.S. at 253 n. 6, 101 S.Ct. at 1094 n. 6. The guidelines for establishing a prima facie case were never intended to be rigid, mechanized, or ritualistic. Rather, they are merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination. A prima facie case under *McDonnell Douglas* raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors, such as sex. *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978).

The defendants concede the first two components of the prima facie case [8]; they contest the last two. The City contends that the plaintiff could not have been rejected because no vacancy existed in October 1984, when she was interviewed. The true absence of a vacancy in the job sought is unquestionably a legitimate reason for not hiring an applicant. *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 358 n. 44, 97 S.Ct. 1843, 1866 n. 44, 52 L.Ed.2d 396 (1977). However, under these facts, the court finds that a vacancy did in fact exist—it was only upon the realization that the plaintiff was

---

7. 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

8. The defendants stipulated that the plaintiff is a female and that she met the minimum qualifications for the job.

the most qualified applicant for the job that the moratorium on hiring was instituted. This finding is clearly supported by a number of compelling facts. First, it is inherently inconsistent that a municipality's mayor and board of aldermen would discuss the need for an additional police officer at a board meeting, vote to advertise the position, and accept applications for the job if, in reality, no vacancy existed. The evidence is abundant that then-Sheriff Cotten knew that his department was understaffed and that he communicated his need for more police officers to the board. The payroll records clearly reflect that the police department was understaffed by at least one officer when the plaintiff applied; the balance in the city budget's unappropriated funds as of October 31, 1984, was $85,643.37.[9] The City's decision to "kill the idea" of hiring a much-needed police officer was the direct result of Janet Storey's interest in the position. The most telling evidence of the fact that a vacancy existed is the excessive amount of overtime hours logged by the police officers during the 18-month period in which no hiring was done. The hours speak for themselves; and Chief Cotten candidly admitted that at times he could have funded more than one additional officer's salary from the money paid in overtime. In *Wooten v. New York Telephone Co.*, 485 F.Supp. 748 (S.D.N.Y. 1980), a Title VII case arising from racially discriminatory discharges, it was held that the failure of the company to replace 10 discharged black employees did not preclude a prima facie showing of discrimination. Rather than seeking replacements for the terminated black employees, the telephone company distributed overtime among the remaining white workers. Thus the fourth prong of the prima facie test (that the position remained open) would appear unsatisfied. However, as noted by the *Wooten* court, *id.* at 759, prima facie proof varies greatly from case to case, and

the four specific elements are "not necessarily applicable in every respect to differing factual situations." *McDonnell Douglas*, 411 U.S. at 802 n. 13, 93 S.Ct. at 1824 n. 13. The condonation of the practice of giving overtime to nonminorities to avoid hiring minorities would provide an employer with an effective subterfuge for invidious discrimination: anytime a qualified minority applicant responded to an advertisement, the employer could simply increase the hours of the current employees and eliminate the vacant position. This is not to say that an employer is stripped of the freedom to exercise sound business judgment in determining the number of employees it requires or when *not* to replace a terminated worker. Title VII imposes no obligation on the employer to hire anyone *unless the refusal is motivated by discrimination.* *Kennan v. Pan American World Airways*, 424 F.Supp. 721, 726 n. 3 (N.D.Cal.1976) *citing Evans v. United Air Lines*, 534 F.2d 1247, 11 E.P.D. ¶ 10,865 at 6814 (7th Cir.1976) (emphasis added). Therefore, once an employer makes a conscious, deliberate decision to fill a position, advertises the vacancy, and accepts applications, it will be hard put to claim that a legitimate business judgment was thereafter made to eliminate the position, especially when the only significant intervening event is the appearance of a qualified minority applicant. In that context, discrimination is the only logical explanation for not filling the vacancy. While most discrimination suits arise when a nonminority is hired over a minority applicant, *Wooten* is not the lone case holding that hiring moratoriums may be construed as discriminatory. *See also Dumas v. Town of Mount Vernon, Alabama*, 612 F.2d 974 (5th Cir.1980) (abolition of a position to avoid hiring a black), cited with approval in *Howard v. Summit Co. Welfare Dept.*, 525 F.Supp. 1084, 1091 (N.D.Ohio 1981) (Contie, J.) and *Tye v. Board of Education of the*

---

**9.** The budget adopted by the City of Sparta for the fiscal year July 1, 1984, through June 30, 1985, did not reflect an appropriation for the police department from which an additional police officer could be paid. However, the budget for fiscal year 1985–1986 also contained no such extra funding, and in April of 1986 an additional full-time officer was hired. Since the City obviously used budget amendments to fund extra positions, it will not be heard to argue that the vacancy did not exist because it did not appear in the proposed budget, especially in light of the healthy condition of the unappropriated funds account.

*Polaris Joint Vocational School District,* 811 F.2d 315 (6th Cir.1987) (where it was held that a remaining guidance counselor "replaced" the terminated counselor because the jobs were consolidated and the tasks remained the same).

The defendants also argue that the fourth prong of the prima facie test has not been shown because the City did not continue to accept applications for the advertised position after November 1, 1984, the date of the plaintiff's rejection. The court quickly dismisses this contention since the application of Mary Ellen Frasier for a position with the police department was accepted on November 2, 1984. Additionally, as addressed hereinabove, the City's implementation of a significant amount of overtime hours is equivalent to hiring an additional officer, demonstrating clearly that the position remained open until filled by the remaining employees' performance on overtime.

■■■ We find that the plaintiff has established a prima facie case of sexual discrimination according to the *McDonnell Douglas* framework. Furthermore, had the plaintiff been unsuccessful at any stage of the four-step analysis, her failure to establish the traditional prima facie case would not compel a judgment in favor of the defendants, because in this case direct evidence of sexual discrimination is present. The *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination. The shifting burdens of proof espoused by *McDonnell Douglas* and its progeny are designed to guarantee that the plaintiff has his day in court despite the unavailability of direct evidence. *Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 121, 105 S.Ct. 613, 622, 83 L.Ed.2d 523 (1985). Direct evidence and the *McDonnell Douglas* formulation are simply different evidentiary paths by which to resolve the ultimate issue of defendant's discriminatory intent. *Blalock v. Metals Trades, Inc.,* 775 F.2d 703, 707 (6th Cir.1985). Direct evidence of discrimination is shown in this case by a number of comments made by Chief Cotten and members of the board of aldermen.

Chief Cotten flatly told the plaintiff he would not hire her because she was a woman. While he tempered this remark with the explanation that because of the HUD ultimatum the City was seeking racial minorities, their failure to employ a minority when hirings took place in 1986 greatly discredits that justification. Furthermore, HUD did not single out the police department over other city departments for employment of racial minorities. Even more telling was Chief Cotten's warning to the plaintiff that there might be an attitude problem among the city aldermen regarding hiring a female police officer. Additionally, during her interview she was questioned about her husband's attitude toward her interaction with male police officers. Unquestionably, the officials of the City of Sparta possessed discriminatory intent.

■■■ While at first glance it appears that the discriminatory posture of the Sparta officials changed on March 11, 1986, when a female police officer was hired, closer scrutiny reveals that the discriminatory animus was alive and well. Ms. Anderson was hired only as a temporary officer with no promise of future permanent employment although the City desparately needed police officers. Only a few days later, a male officer was hired on a permanent basis. Chief Elsberry admitted that Ms. Anderson wanted the permanent position and offered no explanation as to why she was denied permanent status in spite of the City's avowed policy of promoting from within. The scenario is easy to picture: At the March 6, 1986, board meeting the city officials were aware of Ms. Anderson's application on file from the previous solicitation of police chief applicants. At this point, the department was down to 12 officers because of Officer Price's vacancy, and additional officers were essential. The board's motions were uncharacteristically specific at this meeting and clearly motivated by their reluctance to hire a female as a permanent police officer and their unwillingness to employ the plaintiff. Faced with the prospect of *two* qualified females, they mandated hiring only a certified officer or one able to be certified

through transfer (as Ms. Anderson's application reflected) *and* emphasized that this "temporary" employee should understand that they would receive no preference for a future full-time position in contradiction of their city policy of moving up the ranks. The board's behavior in tailoring the requirements for hiring a temporary officer to the application of Ms. Anderson demonstrates their unlawful retaliation against the plaintiff, in violation of 42 U.S.C. § 2000e–3(a), for bringing this lawsuit. The elements for establishing a prima facie retaliation claim are:

(1) that plaintiff engaged in an activity protected by Title VII,

(2) that the exercise of his civil rights was known by the defendant,

(3) that, thereafter, the defendant took an employment action adverse to the plaintiff; and

(4) that there was a causal connection between the protected activity and the adverse employment action.

*Wrenn v. Gould*, 808 F.2d 493 (6th Cir. 1987). The class of activities protected by Title VII's prohibition of retaliation is not confined to situations where parties are engaged in formal proceedings, but rather extends to forbid "discrimination against applicants for attempting to protest or correct allegedly discriminatory conditions of employment." *Hearn v. R.R. Donnelley & Sons Co.*, 460 F.Supp. 546, 548 (N.D.Ill. 1978) *citing McDonnell Douglas*, 411 U.S. at 796, 93 S.Ct. at 1821. Clearly, the plaintiff was protesting the discriminatory failure to hire when she threatened the EEOC action. The evidence shows that the city officials were well aware of her intention to file an EEOC complaint if not offered a position on the police force. She told Chief Cotten of her intent, and he reacted angrily by telling her she had "better be ready to back it up." Every city official who testified denied knowledge of the plaintiff's threat to sue prior to the November 1, 1984, meeting at which she was rejected, a denial which is found to be incredible and unworthy of belief. It defies every canon of human nature to assume that notice of the potentiality of a discrimination lawsuit would not be passed along to city officials immediately.

Since the remedies for retaliatory refusal to hire are identical to the relief provided for discriminatory failure to hire, they are addressed jointly hereinafter.

Making Officer Anderson's position a "temporary" one at a lower salary with fewer fringes when the obvious hiree (because of her superior qualifications) would be a woman reveals the City's calculated efforts to minimally comply with the technicalities of the law without genuinely providing equal opportunities for women. Consequently, this is a case where direct evidence of sexual discrimination exists so that even the absence of a prima facie showing would not exonerate the defendants.

■ In support of its failure to hire, the defendants offer first the justification that no vacancy existed. This explanation is decidedly pretextual as fully discussed *supra*. Next, it is argued that the solicitation of applicants in October of 1984 was to attract racial minorites for hiring to guarantee continued federal funding. This allegation, too, has been addressed above in outlining the plaintiff's prima facie case. Additionally, the court disbelieves this explanation because it is obvious that applicants for police officers were sought for the simple reason that the force was understaffed and overworked. The plaintiff was rejected, not because of what she wasn't —a black—but, rather, because of what she was—a woman.

■ The defendants argue also that the board was extremely financially conservative and refused to hire a police officer because it saw the creation of additional positions as unnecessary. To view hiring additional officers as extravagant and nonessential is inherently inconsistent with the severe understaffing, the excessive overtime, and especially with the advertisement of the intent to hire. It is significant to note that although the proposed budgets were notoriously meager, budget amendments at year's end were routinely implemented to accommodate whatever adjustments were necessary throughout the year.

It was only when the plaintiff applied that the City took the position that no money existed in the budget to fund the position. We reject entirely the theory of a miserly board to justify the failure to hire.

Finally, the defendants contend that because an election intervened in April 1985, the new officials were unfamiliar with police department personnel and needs. Since the discriminatory rejection in this case occurred in November 1984 and not thereafter,[10] it is unnecessary to address the alleged unfamiliarity of the board with proper hiring practices. However, we do note that anyone who seeks and is awarded a government post is obligated to quickly become familiar with the basics of the duties he is to perform on behalf of the citizens he seeks to represent—at *least* to the extent that he not commit unlawful discrimination.

Having determined that the plaintiff is entitled to a judgment for both sexual discrimination and retaliatory failure to hire, the court now addresses the proper measure of damages.

■ Because the defendants acted under color of state law when they violated the plaintiff's civil rights by failing to hire her, they are guilty of violating 42 U.S.C. § 1983. Title VII provides the exclusive remedy when the only § 1983 course of action is based on a violation of Title VII, *Day v. Wayne Co. Board of Auditors,* 749 F.2d 1199, 1204 (6th Cir.1984), and therefore no additional relief shall be awarded for the § 1983 violation. Since the plaintiff will be made whole by the hiring mandate and the back pay and job benefits award, any § 1983 damages would be cumulative. *Allen v. Lovejoy,* 553 F.2d 522, 525 (6th Cir.1977). Title 42, United States Code, § 2000e–5(g) provides in pertinent part:

(g) If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay ... or any other equitable relief as the court deems appropriate.

The victim of discrimination is entitled to be "made whole"—that is, to be put in the same position she would occupy had the failure to hire not occurred. *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 418, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). A claimant should receive the salary, including any raises which would have been received but for the discrimination. *Rasimas v. Michigan Dept. of Mental Health,* 714 F.2d 614, 626 (6th Cir.1983) *cert. denied,* 466 U.S. 950, 104 S.Ct. 2151, 80 L.Ed.2d 537 (1984). The defendants have the burden of showing that the plaintiff has failed to reasonably mitigate her damages.

■ From the date of discrimination, November 1, 1984, through March 24, 1987, the plaintiff earned a total of $4,862.20 through her employment as a waitress. She was unemployed through 1985 and part of 1986. However, the proof shows that she was diligent in her search for employment as a police officer, having made application with the cities of Monterey, Livingston, Baxter, Memphis, Algood, Chattanooga, Cookeville, Knoxville, Nashville, as well as with the Tennessee Highway Patrol and the Tennessee Alcoholic Beverage Commission. Therefore, the defendants have failed to show that the plaintiff was unreasonable in her attempts to mitigate damages.

---

**10.** The court finds the qualifications of officers Bartold and O'Conner to be superior to those of the plaintiff and therefore constituting a legitimate, nondiscriminatory reason for not hiring her in 1986. It is reasonable to assume that in 1986 when the City finally lifted the hiring moratorium, they did so because they had at last located applicants with obviously better qualifications (more experience) than the plaintiff. At this point they were no doubt very careful about hiring only experienced, impressive candidates. However, such was not the case in November of 1984 when she was the most qualified applicant and the only applicant to receive an interview. At that point they discriminated against her solely because of her sex; their failure to discriminate again is irrelevant.

Accordingly, the Clerk shall enter an order providing the following relief:

1. The City of Sparta Police Department is ordered to hire the plaintiff as a permanent police officer, immediately, at the wage rate of $5.72 per hour, which is the salary currently being paid comparable officers. As an employee of the Sparta Police Department, the plaintiff shall be provided with all the fringe benefits of a permanent police officer, including medical insurance, uniform allowance, retirement, vacation time, longevity pay, and future POST supplements upon her certification. The plaintiff shall attend the Police Training Academy in Donelson, Tennessee, during its next certification class, and the defendants shall bear the expense of plaintiff's certification. Regardless of the date of certification, the plaintiff shall be placed on the police force immediately.

2. The plaintiff is awarded backpay in the amount of $23,856.60, which reflects the salary which would have been paid to a police officer hired on November 1, 1984, through the date of this judgment in the amount of $28,718.80, as compiled from the City of Sparta payroll records according to the testimony of Mr. Carmichael, the city administrator, less the wages earned by the plaintiff during this period in the amount of $4,862.20. The plaintiff shall provide to the defendant a supplemental report of wages earned during the period of March 25, 1987, through the date of this judgment and the $23,856.60 backpay shall be reduced accordingly. Additionally, the plaintiff is entitled to $600.00, reflecting the salary supplement she would have received in 1985 as a certified police officer from the Police Officer Standards Training Commission.[11] The plaintiff shall be awarded retirement benefits in the amount of $1,294.69 which represents the amount of retirement which would have accrued from November 1, 1984, through the date of this judgment. The City shall deposit $1,294.69 into its retirement fund for the plaintiff to reflect the proper current balance had she been employed since the date of discrimination. The plaintiff is entitled to reimbursement for any medical insurance premiums she paid since November 1, 1984, or for any medical expenses she incurred during that period which would have been paid by the medical insurance coverage provided by the City of Sparta to its full-time police officers. The plaintiff is entitled to longevity pay in the amount of $263.00.

3. The City of Sparta and its officials shall be permanently enjoined from further violations of Title VII.

4. Plaintiff's counsel shall be awarded reasonable attorney fees to be taxed as part of the costs which are hereby adjudged against the defendant. 42 U.S.C. § 2000e–5(k). Attorneys for the plaintiff shall submit affidavits of time expended and hourly rate in this matter to the court with copy to the defendants within twenty (20) days. The defendant shall then respond if it objects to the amount of the requested fees within twenty (20) days. If no agreement can be reached between the parties, the amount of attorney fees shall be resolved by the court.

An appropriate order shall be entered.

---

11. No proof was introduced regarding entitlement to a POST salary supplement in 1986.